## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JANE DOE, a minor,
by her next friend L.C.,

     Plaintiff,

                                   Case No. 1:18-cv-1023

v.                                     Hon.

MICHIGAN STATE UNIVERSITY,
THE BOARD OF TRUSTEES OF
MICHIGAN STATE UNIVERSITY,
LAWRENCE GERARD NASSAR (individually),
and WILLIAM D. STRAMPEL (individually),

     Defendants.

Jennifer B. Salvatore (P66640)
Nakisha N. Chaney (P65066)
SALVATORE PRESCOTT & PORTER
Attorneys for Plaintiff
105 E. Main Street
Northville, Michigan 48167
(248) 679-8711
salvatore@spplawyers.com
chaney@spplawyers.com

## COMPLAINT AND JURY DEMAND

*This case is related to multiple actions brought against Defendants Lawrence Nassar, Michigan State University and the Board of Trustees of Michigan State University, including Denhollander, et al, v. Michigan State University, et al., Case No. 1:17-cv-29.*

     Plaintiff Jane Doe, by and through her attorneys, SALVATORE PRESCOTT & PORTER,

submits her Complaint and states as follows:

## PRELIMINARY STATEMENT

1.      For more than 20 years, convicted sex offender and former Michigan State University (MSU) physician, Defendant Lawrence Nassar, exploited the trust and authority accorded to him by his physician status, standing with MSU, and prominence within the gymnastics community.

2.      Nassar sexually preyed upon the girls and women in his medical care, resulting in the sexual and emotional traumatization of hundreds of female patients, including Plaintiff.

3.      Under the guise of providing medical "treatment," Nassar committed vile acts of sexual abuse, including, but not limited to, nonconsensual, ungloved vaginal and anal penetration of female patients, some of whom were children, including Plaintiff.

4.      As early as 1997 or 1998, MSU personnel were on notice of Nassar's abuse, yet MSU did not take any investigative or corrective action. Instead MSU accorded Nassar a position of prominence and permitted Nassar to continue practicing medicine with unfettered access to female patients.

5.      In 2015, Plaintiff, a 14-year old high school freshman who suffered back pain arising from her competitive gymnastics career, began treating with Nassar, unaware of his propensity for sexually assaulting the girls in his medical care.

6.      Plaintiff treated with Nassar multiple times from October through December 2015, during which time Nassar, under the guise of providing medical treatment, molested, massaged and penetrated Plaintiff, including an occurrence in which Nassar digitally penetrated Plaintiff's vagina during her first menstrual cycle.

7.      This is a civil action for harm suffered by Plaintiff as a result of the acts, conduct and omissions of Defendants Michigan State University ("MSU"), the Board of Trustees of MSU

("MSU Trustees"), Lawrence Nassar, and William Strampel relating to Nassar's sexual assault, abuse, molestation, nonconsensual sexual touching, and harassment of Plaintiff.

8.      The acts, conduct, and omissions of the MSU Defendants as well as their policies, customs, and practices with respect to investigating sexual assault allegations severely compromised Plaintiff's safety and health and resulted in repeated instances of sexual assault, abuse, and molestation by Nassar, causing Plaintiff devastating harm.

9.      Defendants' conduct before, during, and after the sexual assault, abuse, and molestation of Plaintiff and others was in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq*., 42 U.S.C. §1983; the Patient Protection and Affordable Care Act, §1557, 42 U.S.C. §18116; the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1591 and §1595, and other related laws.

## PARTIES, JURISDICION AND VENUE

10.      Plaintiff Jane Doe is a minor and resident of Michigan.

11.      Plaintiff's Complaint is brought by her mother and next friend, L.C., who also resides in Michigan.

12.      Defendant Michigan State University ("MSU") is a public university organized under the laws of Michigan.

13.      Defendant The Board of Trustees of Michigan State University ("MSU Trustees") is the governing body for MSU.

14.      Defendant MSU and MSU Trustees are collectively referred to herein as the "MSU Defendants."

15.      Defendant Lawrence "Larry" Nassar was a Doctor of Osteopathic Medicine and, at all relevant times, resided in Michigan. Nassar is currently incarcerated and, upon information and

belief, is in the custody of the Federal Bureau of Prisons for, among other things, criminal sexual conduct.

16.     Defendant William D. Strampel was the Dean of the College of Osteopathic Medicine at Michigan State University and served as Dean beginning in approximately April 2002. Strampel resigned in or around December 2017 and currently faces multiple criminal charges related to allegations that he used his position at MSU to harass, demean, sexually proposition and sexually assault female students, as well as charges arising from misconduct associated with a Title IX investigation involving Nassar.

17.     This action arises from Defendants' blatant disregard for Plaintiff's rights, and Defendants' deliberately indifferent and unreasonable response to physician-on-patient and adult-on-child sexual assault, abuse, and molestation.

18.     At all relevant times, Nassar and Strampel acted within the scope of their employment and agency with MSU.

19.     At all relevant times, MSU, MSU Trustees, Nassar and Strampel were acting under color of law, namely under color of statutes, ordinances, regulations, policies, customs, and/or usages of the State of Michigan and/or Michigan State University.

20.     Plaintiff's federal statutory claims are brought pursuant to Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et seq.*; the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §1591 and §1595; and the Patient Protection and Affordable Care Act § 1557, 42 U.S.C. §18116 (2012) (Section 1557).

21.     Plaintiff's federal constitutional claims is brought pursuant to the Fourteenth Amendment of the United States Constitution and 42 U.S.C. §1983.

4

22. This Court has original subject matter jurisdiction over Plaintiff's federal claims under Section 1557, 18 U.S.C. §1595, 28 U.S.C. §1331, which gives district courts jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States, and 28 U.S.C. §1343, which gives district courts original jurisdiction over any civil actions authorized by law to be brought by any person to redress the deprivation, under color of any State Law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States, and any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

23. The events giving rise to this lawsuit occurred in Ingham County, Michigan, which is situated in the Southern Division of the Western District of Michigan.

24. Pursuant to 28 U.S.C. §1391(b)(2), venue is proper in the United States District Court for the Western District of Michigan, as this is the district in which the events giving rise to the claim occurred.

## **GENERAL ALLEGATIONS**

25. Plaintiff incorporates here all previously stated allegations.

**Defendant Lawrence Nassar**

26. Defendant Lawrence Nassar graduated from MSU with a Doctor of Osteopathic Medicine degree in or around 1993.

27. MSU employed Nassar from in or around 1996 to 2016 in multiple positions, including but not limited to:

    a. Associate Professor, Defendant MSU Division of Sports Medicine,  Department Radiology, College of Osteopathic Medicine;

b. Team Physician, MSU Men's and Women's Gymnastics Team;
c. Team Physician, MSU Men's and Women's Track and Field;
d. Team Physician, MSU Intercollegiate Athletics;
e. Medical Consultant, MSU Wharton Center for the Performing Arts;
f. Advisor, Student Osteopathic Association of Sports Medicine.

28.     As an Assistant and/or Associate Professor for MSU Division of Sports Medicine, Nassar provided medical services for MSU's Sports Medicine Clinic.

29.     The Sports Medicine Clinic is an MSU facility that is controlled, operated and governed by the MSU Defendants.

30.     For over 20 years, MSU's Sports Medicine Clinic has provided health care to people, including members of the public who were otherwise not affiliated with MSU, including Plaintiff.

31.     When the MSU Defendants operated the MSU Sports Medicine Clinic and provided medical services to Plaintiff and others, they were acting as an arm of the State.

32.     The MSU Sports Medicine Clinic charged patients, including Plaintiff, for their receipt of medical services.

33.     Charging Plaintiff (and others) and billing insurance companies for medical services is an activity proprietary in nature, and it created a fiduciary and special relationship between Plaintiff and the MSU Defendants.

34.     The MSU Defendants charged fees comparable to specialists for the services provided at the MSU Sports Medicine Clinic.

35.     The MSU Sports Medicine Clinic engaged in proprietary functions by entering into the business of providing medical services for the primary purpose of raising funds and making a profit for the MSU Defendants.

36.     The MSU Sports Medicine Clinic cannot be normally supported by taxes and fees.

37.     By seeking medical treatment and services from MSU's Sports Medicine Clinic and from Nassar while in the course of their employment, agency, and/or representation with the MSU Defendants, a special, confidential and fiduciary relationship existed between Plaintiff, the MSU Defendants, and Nassar.

38.     As an MSU employee and agent, Nassar maintained an office at MSU in East Lansing, Michigan, and practiced osteopathic medicine at MSU's Sports Medicine Clinic.

39.     As a physician of osteopathic medicine, Nassar's medical care and treatment should have consisted largely of osteopathic adjustments and kinesiology treatment of patients.

40.     Nassar is not and has never been a medical doctor of obstetrics or gynecology.

41.     Nassar is not and has never been trained or certified as a pelvic floor therapist.

42.     During his employment, agency and representation with the MSU Defendants, Nassar sexually assaulted, abused and molested multiple girls and women, including Plaintiff, by engaging in nonconsensual sexual touching, assault, and harassment, including but not limited to ungloved, digital vaginal and anal penetration.

43.     The State of Michigan's Department of Licensing and Regulatory Affairs Occupational Health Standards regarding Bloodborne Infectious Diseases mandates use of gloves when exposed to potentially infectious material, including vaginal secretions.

**Early Reports of Sexual Abuse to Michigan State University**

44.     Reportedly, from in or around 1997 to 2000, MSU personnel were on early notice that Nassar was sexually assaulting female patients, having received multiple sexual abuse complaints, including but not limited to:

a.  Larissa Boyce to MSU Gymnastics Coach Kathy Klages in 1997 or 1998;

b. Christie Achenbach, who, in 1999, reported concerns about Nassar's conduct and "treatment" to Kelli Bert, head coach of MSU's Track and Field Team/Program, as well as to others; and

c. Tiffany Thomas Lopez who, in 2000, reported Nassar to MSU personnel, including trainers, for sexual assault and abuse suffered when Nassar provided medical "treatment," including ungloved vaginal penetration.

45. Upon information and belief, between 2000 and 2002, Jennifer Rood Bedford raised concerns to her MSU athletic trainer regarding Nassar's conduct during medical appointments.

46. Upon information and belief, in or around 2004, Kyle Stephens reported inappropriate conduct and sexual touching to MSU clinical psychologist Gary Stollak.

47. Pursuant to Michigan State University's Office of Institutional Equity policy, MSU's personnel with knowledge of Nassar's abuse had a duty to take further action, including:

a. "to promptly take steps to investigate or otherwise determine what occurred and then to address instances of relationship violence and sexual misconduct when it knows or should have known about such instances";

b. to inform "the MSU Police Department of all reports it receives regarding sexual assaults";

c. to "take immediate steps to initiate the investigatory process to determine what happened and to resolve the matter promptly and equitably";

d. to "take prompt, responsive action to support a claimant and … take steps to eliminate, prevent, or address a hostile environment if it determines that one exists";

e. to conduct a prompt, adequate, reliable, and impartial investigation to determine what occurred and then to take appropriate steps to resolve the situation when it learns of an incident of sexual misconduct;

f. independently investigate complaints of relationship violence and sexual misconduct;

g. to conduct an investigation by the Office of Institutional Equity under the direction of the Deputy Title IX Coordinator for Investigations; and

h. to promptly report allegations of sexual misconduct to the Office of Institutional Equity.

48.     Despite knowledge of the sexual abuse, and in violation of state and federal law, MSU failed to take any meaningful action in response to the 1997/1998, 1999 and 2000 complaints.

49.     Because MSU took no meaningful corrective action prior to 2016, multiple girls and women, including Plaintiff, were sexually assaulted, abused and molested by Nassar under the guise of medical treatment, including by nonconsensual vaginal digital penetration, nonconsensual sexual touching of the vaginal and anal areas without the use of gloves or lubricant, and nonconsensual touching and groping of the breasts and buttocks.

50.     In 2014, the U.S. Department of Education's Office of Civil Rights ("OCR") conducted an investigation into an unrelated complaint of sexual assault and retaliation and examined MSU's policies, practices and customs with regard to their Title IX obligations and responses to sexual misconduct complaints.

51.     Upon information and belief, Strampel met with Nassar on July 29, 2014, and determined that several steps would be taken by Nassar moving forwards. These steps were memorialized in an email sent from Strampel to Nassar the following day, stating:

"*1) We will have another person, (resident, nurse, etc) in the room whenever we are approaching a patient to perform procedures of anything close to a sensitive area.*

*2) The procedure which caused the patient emotional distress because of her interpretation will be modified in the future to be sure that there is little to no skin to skin contact when in these regions. Should it become absolutely necessary, the procedure will be explained in detail with another person in the room for both the explanation and procedure.*

*3) New people in our practice will be oriented to ensure they understand these requirements."* [1]
("2014 Guidelines)

---

[1] Michigan State University Police Department Case Report, Case No. 1758100918 at 6, March 13, 2017, found at http://mediad.publicbroadcasting.net/p/michigan/files/201712/fbi_investigation_into_nassar.pdf?_ga=2.1 52984505.1632131856.1536015064-151137188.1536015064, downloaded September 3, 2018.

52. Strampel did not inform anyone else of the July 30, 2014 email or the guidelines within it, with the possible exception of MSU Sports Medicine physician Douglas Dietzel.

53. Dietzel, however, denies knowledge of the guidelines prior to Nassar's termination in or around 2016.

54. Strampel reported to law enforcement that he did not see the need to follow-up to ensure that Nassar was complying with the guidelines that were common sense for all physicians.

55. He also admitted to law enforcement officers that, at the time, in 2014, there were no formal procedures or policies in place specifically mandating care providers to have a chaperone in the room when treating a minor patient in a "private or sensitive area."[2]

56. As reported in the March 2017 MSU Police Case Report for Case No. 17158100918 ("Case Report"), Strampel also said that he had to be conscious of sharing information with other employees in Sports Medicine (specifically nurses and medical assistants) because they did not know about the investigation that had taken place, and since Dr. Nassar was cleared of all wrong doing, he (Strampel) did not feel it was appropriate to tell them about it.[3]

57. Among other things, Strampel's failure to inform MSU Sports Clinic personnel of the 2014 guidelines and to enforce the guidelines contributed to the continued sexual victimization of Nassar's female patients.

58. According to the Case Report, "at least twelve assaults have been reported that occurred after 07/30/14. Many of the sexual assaults occurred in examination rooms at MSU Sports Medicine and involved the lack of a chaperone during sensitive procedures and un-gloved skin-to-skin contact."[4]

---

[2] *Id.* at 7.
[3] *Id.* at 7.
[4] *Id.* at 6.

59.     Additional complaints of sexual misconduct against Nassar surfaced in 2014, in which the victim accused Nassar of cupping her breast, massaging her breast and vaginal areas, and becoming sexually aroused.

60.     Reportedly, these complaints were investigated by MSU's Office of Institutional Equity, but it was ultimately determined that the complainant did not understand the nuanced difference between sexual assault and medical procedures.

61.     Upon receipt of a victim's complaint for criminal sexual conduct, MSU police began a criminal investigation into Nassar in or around May 2014, which, upon information and belief, continued through July 2015, when it was forwarded to the Ingham County Prosecutor's Office and later declined for prosecution in December 2015.[5]

62.     On or around September 1, 2015, OCR concluded its Title IX investigation.

63.     OCR determined that "a sexually hostile environment existed … at the University … and that the University's failure to address complaints of sexual harassment, including sexual violence, in a prompt and equitable manner caused and may have contributed to a continuation of this sexually hostile environment."[6]

64.     MSU entered into a Resolution Agreement with OCR requiring MSU to take steps to "ensure that it will promptly and equitably respond to all incidents of sexual and gender-based harassment, assault and violence of which the University has notice (including incidents that the University knew of reasonably should have known about); take prompt and effective steps to end

---

[5] Michigan State University Police Department Case Report, Case No. 1758100918, March 13, 2017, found at http://mediad.publicbroadcasting.net/p/michigan/files/201712/fbi_investigation_into_nassar.pdf?_ga=2.1 52984505.1632131856.1536015064-151137188.1536015064, downloaded September 3, 2018.
[6] Letter, U.S. Department of Education Office for Civil Rights, September 1, 2015, found at https://www.documentcloud.org/documents/2644770-OCR-Letter-to-Michigan-State-Closing-Investigation.html, downloaded September 3, 2018.

the sexual and gender-based harassment, assault and violence; eliminate any hostile environment; prevent its reoccurrence; and, as appropriate, remedy its effects on the complainant and others."[7]

65.     Despite these findings, MSU failed to take prompt and effective steps to end the sexual and gender-based harassment, assault and violence committed by Nassar, of which it knew or should have known, resulting in Plaintiff's subsequent victimization in and after October 2015.

**Plaintiff Is Sexually Abused by Nassar**

66.     In 2015, Plaintiff was a 14-year old freshman and competitive gymnast.

67.     Prior to her treatment with Nassar, Plaintiff was a straight-A student and champion gymnast who was on the fast-track to collegiate-level gymnastics.

68.     In October 2015, on referral by her primary care physician, and at her coach's recommendation, Plaintiff began treating with Nassar at the MSU Sports Medicine Clinic for back issues related to her gymnastics career.

69.     Nassar and the MSU Sports Medicine Clinic provided medical care to Plaintiff for pay, which money was received from Plaintiff's parent's health insurance company.

70.     As such, Plaintiff was a business invitee at the MSU Sports Medicine Clinic where she expected to receive medical care and treatment by Nassar, free of harm.

71.     Although it had prior notice of abuse allegations, MSU failed to warn Plaintiff of the known or foreseeable dangers regarding complaints related to Nassar.

72.     The MSU Defendants and Strampel did not advise, or direct others to advise, Plaintiff that Nassar was the subject of an ongoing criminal investigation.

---

[7] Resolution Agreement, OCR Docket Numbers 15-11-2098 and 15-14-2113, found at https://www2.ed.gov/documents/press-releases/michigan-state-agreement.pdf, downloaded on September 3, 2018.

73.     The MSU Defendants and Strampel did not notify Plaintiff or her parents of the requirements of the 2014 guidelines.

74.     The MSU Defendants and Strampel did not ensure, or direct others to ensure, that a medically-knowledgeable chaperone was present during Nassar's treatment of Plaintiff, which included ample skin-to-skin contact and touching of Plaintiff's "sensitive areas."

75.     As a result of all Defendants acts and omissions, from October through December 2015, Plaintiff was sexually abused by Nassar multiple times under the guise of performing medical procedures.

76.      Nassar subjected Plaintiff to multiple acts of sexual assault, molestation and harassment, including but not limited to performing full body massages, inappropriately touching Claimant's butt, and digitally penetrating Claimant.

77.     During the visits, Nassar routinely put his hand on and "up" her butt, while purportedly adjusting or examining her back.

78.     Plaintiff could feel Nassar's fingers inside her.

79.     Nassar also gave Plaintiff full body massages.

80.     On one occurrence, while massaging Plaintiff, who was clothed only in her bra and underwear, Nassar pulled Plaintiff's underwear to the side and, ungloved, digitally penetrated Plaintiff's vagina with his finger. Plaintiff had her first period during this procedure. She was embarrassed and concerned that Nassar got blood on his hands.

81.     Nassar targeted female patients, including Plaintiff, for sexual assault.

82.     Around the time she was receiving treatment, Plaintiff talked to her teammates about Nassar's "treatments" and asked if the same thing was happening with them. They told her that it was and that it was a normal part of his treatment.

83.     Plaintiff stopped treating with Nassar in or around December 2015.

84.     Soon thereafter, Nassar's sexual abuse received widespread media coverage.

85.     After learning that Nassar was, in fact, sexually abusing her during the medical visits, Plaintiff began to withdraw.

86.     She focused intently on the news coverage of Nassar's case.

87.     Her grades dropped.

88.     Whereas Plaintiff was a 4.0 student in middle school, by her sophomore year, her GPA fell to about a 2.5.

89.     Due to her failing GPA, Plaintiff almost got kicked off of the gymnastics team.

90.     However, she eventually told her coach and school counselor what happened to her.

91.     Plaintiff received counseling, but had to stop when her insurance would no longer pay.

**Nassar Arrested and Convicted for Criminal Sexual Conduct with Minors**

92.     In November 2016, Nassar was arrested and charged in Ingham County, Michigan, on three charges of first-degree criminal sexual conduct with a person under 13.

93.     In December 2016, Nassar was indicted, arrested, and charged in federal court in Grand Rapids, Michigan, on charges of possession of child pornography and receipt/attempted receipt of child pornography.

94.     On February 7, 2017, an additional count was added to Defendant Nassar's federal charge for destruction and concealment of records and tangible objects as Nassar "caused a third

party vendor to permanently delete and destroy all images, records, documents, and drives contained on the hard drive of a laptop computer, and [Nassar] threw in the trash a number of external hard drives" while under investigation for "his possession of child pornography, his receipt and attempted receipt of child pornography, and his sexual exploitation and attempted sexual exploitation of children."

95.     On February 22, 2017, Nassar was arraigned on 22 counts of first-degree criminal sexual conduct with a person under 13 years old, and 14 counts of third-degree criminal sexual conduct with a person under the age of 13 years old in Ingham County, Michigan, and Eaton County, Michigan.

96.     On July 10, 2017, Nassar pleaded guilty to the federal charges of child pornography, receipt/attempted receipt of child pornography, and the destruction and concealment of records and tangible objects.

97.     On November 22, 2017, Nassar pleaded guilty to seven counts of first-degree criminal sexual conduct in Ingham County, Michigan.

98.     On November 29, 2017, Nassar pleaded guilty to three counts of first-degree criminal sexual conduct in Eaton County, Michigan.

99.     On December 7, 2017, Nassar was sentenced to a 720 month (60 year) prison term for the federal child pornography charges.

100.    On January 24, 2018, Nassar was sentenced to a 40- to 175-year prison term for criminal sexual conduct in Ingham County, Michigan.

101.    On February 5, 2018, Nassar was sentenced to a 40- to 125-year prison term for the Eaton County charges.

**Strampel Faces Criminal and Administrative Charges for Sexual Misconduct**

15

102. On May 16, 2018, the Michigan Attorney General filed an administrative complaint with the State Department of Licensing and Regulatory Affairs against William Strampel seeking to have his medical license revoked.

103. The administrative charges allege against Strampel allege that Strampel used his position of authority to harass, discriminate, demean, sexually proposition, and sexually assault female students, and that Strampel abused his authority, through threats and manipulation to solicit, receive, and possess pornographic images of women who appeared to be MSU students.

104. On February 2, 2018, pursuant to a search warrant, the Department of Attorney General's Special Agent Investigators seized a computer from Strampel's office on campus, and forensic examination of that computer uncovered approximately 50 photos of nude or partially nude women, sex toys and pornography. Many of these photos appeared to be female MSU students and appeared to be taken by the women in the photos;

105. The forensic examination of Strampel's computer revealed a video of Nassar performing a vaginal procedure on a young female patient.

106. Strampel failed to enforce protocols intended to protect female patients after the 2014 investigation of Nassar.

107. The Attorney General's charges to LARA also allege that Strampel stated in 2016, after he fired Nassar:

     a.   that "patients lie to get doctors in trouble,"

     b.  that he did not believe the accusations against Nassar, and

     c.  that he did not wish to fire Nassar.

**Fraudulent Concealment**

108.    MSU officials, employees and other representatives, including Defendants, knew, or should have known, that Nassar was sexually assaulting patients under the guise of legitimate medical treatment since 1997.

109.    They concealed this information from those at MSU or in the public at large with the ability to investigate, sanction, prevent, and/or otherwise prosecute Nassar's misconduct.

110.    In doing so, they continued to perpetuate the image of Nassar as a world-renowned and highly respected sports physician, who was an asset to the MSU community due to his status.

111.    Such statements and representations were false, and those who made, perpetuated, and/or affirmed them, including the MSU Defendants, knew or should have known they were false, but continued to perpetuate them in order to preserve the comfortable status quo and/or otherwise for their own purposes.

112.    Nassar, as well, through the false construct of his reputation and status as an authority figure, fraudulently represented to his patients that his sexual assaults were part of a legitimate course of medical treatment. He knew these statements and representations were false when he made them.

113.    All such statements described herein were made with the intent that Plaintiff and others rely on them for the proposition that Nassar was a renowned doctor performing legitimate medical procedures, and those who could not tell the "nuanced difference" between legitimate medicine and rape or sexual abuse were mistaken, confused or deluded.

114.    Plaintiff and others reasonably relied on these representations.

115.    Defendants' actions constituted fraudulent concealment.

116.     Such fraudulent concealment reasonably prevented Plaintiff from knowing that she had a cause of action against Nassar, MSU and possibly other defendants, until the news broke of Nassar's misconduct and MSU's decades-long cover-up, after which Plaintiff acted promptly to cooperate with authorities and make her respective report.

117.     Plaintiff is otherwise free from fault, has not contributed to her own injuries, and has at all times made good faith efforts to mitigate her own considerable damages.

**COUNT I**
**TITLE IX VIOLATIONS**
**20 U.S.C. §1681(a),** *et seq.*
*against MSU and MSU Trustees*
_____

118.     Plaintiff restates and incorporates here all previously stated allegations.

119.     Title IX states, "No *person* in the United States shall on the basis of sex be … subject to discrimination under any education program or activity receiving Federal financial assistance …"

120.     Plaintiff is a "person" under the Title IX statutory language. [8]

121.     MSU receives federal financial assistance for its education program and is therefore subject to the provisions of Title IX of the Education Act of 1972, 20 U.S.C. §1681(a), *et seq.*

122.     Defendant MSU is required under Title IX to investigate allegations of sexual assault, sexual abuse, and sexual harassment.

123.     The U.S. Department of Education's Office of Civil Rights has explained that Title IX covers all programs of a school, and extends to sexual harassment and assault by employees, students, and third parties.

_____

[8] 20 U.S.C. §1681(a), *et seq.*

124. Nassar's actions and conduct were carried out under one of MSU's programs, which provides medical treatment to students, athletes, and the public.

125. Nassar's conduct and actions toward Plaintiff, including nonconsensual digital vaginal penetration and molestation, constitute sex discrimination under Title IX.

126. As early as 1997/1998, 1999 and/or 2000, based on the complaints alleged above, an "appropriate person" at MSU had actual knowledge of the sexual assault, abuse, and molestation committed by Nassar upon female patients, including Klages, Bert and Stollack.

127. Strampel also had knowledge of Nassar sexually abusing one or more female patients in 2014, at the latest.

128. Strampel, as well as Klages, Bert and Stollack, were "appropriate persons" within the meaning of Title IX because, in their positions, they had the authority to address the discrimination and institute corrective measures.

129. Strampel had supervisory authority over Nassar with the ability to discipline, suspend or terminate Nassar, or to direct or cause others to discipline, suspend or terminate Nassar.

130. The response of MSU's personnel to reports of sexual abuse, including Strampel's failure to enforce the 2014 guidelines, was clearly unreasonable in light of the known circumstances.

131. The MSU Defendants failed to carry out their duties to investigate and take corrective action under Title IX following multiple complaints of sexual assault, abuse and molestation.

132. The MSU Defendants acted with deliberate indifference to known acts of sexual assault, abuse, and molestation on its premises by failing to investigate and address multiple

allegations of sexual harassment and abuse as required by Title IX, and failing to institute corrective measures to prevent Nassar from violating and sexually abusing other female patients.

133. The MSU Defendants and Strampel acted with deliberate indifference as their lack of response to the allegations of sexual assault, abuse, and molestation was clearly unreasonable in light of the known circumstances, Nassar's actions with female athletes, and his access to young girls and young women.

134. The MSU Defendants' deliberate indifference was confirmed by the Department of Education's investigation into Defendant MSU's handling of sexual assault and relationship violence allegations which revealed that a sexually hostile environment existed and affected numerous students and staff on Defendant MSU's campus, and that the University's failure to address complaints of sexual harassment, including sexual violence in a prompt and equitable manner caused and may have contributed to a continuation of the sexually hostile environment.

135. The sexual abuse Plaintiff suffered was so severe, pervasive and objectively offensive that it deprived her of an educational activity, including medical care.

136. Between the dates of approximately 1996 and 2016, the MSU Defendants acted in a deliberate, grossly negligent, and/or reckless manner when they failed to reasonably respond to Nassar's sexual assaults and sex-based harassment of Plaintiff and others.

137. As a result of Defendants' conduct, Plaintiff suffered, among other things, embarrassment, social withdrawal, and emotional distress.

## COUNT II
## SEX DISCRIMINATION
## PATIENT PROTECTION AND AFFORDABLE CARE ACT §1557
## 42 U.S.C. §18116
### *against Defendants MSU and MSU Trustees*
_____

138. Plaintiff restates and incorporates here all previously stated allegations.

139.    Section 1557 of the Patient Protection and Affordable Care Act, which is codified at 42 U.S.C. §18116, provides that: Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under . . . [T]itle IX of the Education Amendments of 1972 (20 U.S.C. §1681 *et seq.*) . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this [T]itle (or amendments). The enforcement mechanisms provided for and available under . . . [T]itle IX shall apply for purposes of violations of this subsection.

140.    Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* prohibits sex discrimination in programs that receive federal financial assistance.

141.    Plaintiff, as a girl, has a right under 42 U.S.C. §18116 to receive health care services free from discrimination on the basis of sex.

142.    Plaintiff is an "individual" within the meaning of 42 U.S.C. §18116.

143.    Defendant MSU receives Federal financial assistance within the meaning of 42 U.S.C. §18116 because it receives federal financial assistance such as credits, subsidies, or contracts of insurance.

144.    The MSU Defendants employed the services of Nassar, doctors, and other professional and non-professional health care providers who cared for Plaintiff from approximately 2001 to 2014, and held themselves out to the public as competent, careful, and experienced in the care and treatment of patients.

145.    Plaintiff sought medical care from Nassar at the MSU Sports Medicine Clinic.

146. Plaintiff expected to receive medical care for her injuries without being sexually assaulted and without fear of sexual harassment or assault.

147. Nassar's conduct and actions toward Plaintiff, including nonconsensual and assaultive digital vaginal penetration and molestation, constituted sex discrimination under Title IX and 42 U.S.C. § 18116, and otherwise denied Plaintiff the benefits of appropriate medical care.

148. The MSU Defendants, Strampel, and others knew or should have known of Nassar's abuse yet failed to take corrective action.

149. The MSU Defendants are vicariously and/or contractually liable for the actions of their principals, employees, agents, and representatives.

150. The MSU Defendants and Strampel supervised Nassar and/or were in a position to take appropriate action upon learning of concerns of misconduct prior to Plaintiff's receipt of "treatment."

151. The MSU Defendants and Strampel failed to properly train and supervise Nassar related to his treatment of Plaintiffs and with respect to promulgating and enforcing policies and procedures related to patient safety (e.g. use of gloves; consent; nurse attendants, etc.).

152. The MSU Defendants and Strampel are directly liable for their failure to train, educate, and supervise Nassar.

153. Because of Defendants' inaction and deliberate indifference, Defendants forced Plaintiff to endure unnecessary trauma, humiliation, and duress.

154. Because of Plaintiff's sex, Defendants treated Plaintiff with a lack of care, dignity, and respect.

155. The conduct of the MSU Defendants described above constitutes sex discrimination against Plaintiff.

156.     The MSU Defendants perpetrated this discrimination with malice, deliberate disregard for, or deliberate or reckless indifference to Plaintiff's rights.

157.     The MSU Defendants' failure to promptly and appropriately investigate, respond to, and remedy the sexual assaults after they received repeated notice of Defendant Nassar's wrongdoing subjected Plaintiff and countless others to further sexual harassment and sexual assaults as well as a sexually hostile environment—effectively denying them all access to health programs or activities at MSU, and effectively denying them the benefits of appropriate medical care.

158.     In the alternative, the actions or inaction of the MSU Defendants was deliberately indifferent or so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff and constitutes gross negligence that is the proximate cause of Plaintiff's damages.

**COUNT III**
**EQUAL PROTECTION**
**U.S. CONST., AMENDMENT XIV, 42 U.S.C. §1983**
*against Defendants Nassar and Strampel*
_____

159.     Plaintiff restates and incorporates here all previously stated allegations

160.     Plaintiff, as a female, is a member of a protected class under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

161.     Nassar targeted females, including Plaintiff, for sexual abuse.

162.     Plaintiff enjoys the constitutionally protected Due Process right to be free from the invasion of bodily integrity through sexual assault, abuse, or molestation.

163.     At all relevant times Defendants Nassar and Strampel (collectively referred to herein as "Individual Defendants") were acting under color of law.

164. The acts as alleged above amount to a violation of these clearly established constitutionally protected rights, of which reasonable persons in the Individual Defendants' positions should have known.

165. The MSU Defendants and Strampel have the ultimate responsibility and authority to train and supervise their employees, subordinates, agents, and/or representatives in the appropriate manner of detecting, reporting, and preventing sexual abuse, assault, and molestation and as a matter of acts, custom, policy, and/or practice, failed to do so with deliberate indifference.

166. As a matter of custom, policy, and and/or practice, the MSU Defendants and Strampel had the ultimate responsibility and authority to investigate complaints against their employees, subordinates, and representatives from all individuals including, but not limited to students, visitors, faculty, staff, or other employees, agents, and/or representatives, and failed to do so with deliberate indifference.

167. The MSU Defendants and Strampel had a duty to prevent sexual assault, abuse, and molestation on their campus and premises, that duty arising under the above-referenced constitutional rights, as well as established rights pursuant to Title IX.

168. Defendant MSU's internal policies provide that "[a]ll University employees ... are expected to promptly report sexual misconduct or relationship violence that they observe or learn about and that involves a member of the University community (faculty, staff or student) or occurred at a University event or on University property." They state further: "[t]he employee must report all relevant details about the alleged relationship violence or sexual misconduct that occurred on campus or at a campus-sponsored event. . ."

169. Defendant MSU's aforementioned internal policies were violated when the MSU Defendants and Strampel took no actions to address the complaints regarding Defendant Nassar's

conduct, including those by Larissa Boyce in or around 1997/1998, Christie Achenbach in or around 1999, Tiffany Thomas Lopez in 2000 (on more than one occasion), Jennifer Rood Bedford between approximately 2000 and 2002, Kyle Stephens in or around 2004; and the complainant in or around 2014.

170.    The MSU Defendants and Strampel's failure to address these complaints led to an unknown number of females being victimized, sexually assaulted, abused, and molested by Nassar.

171.    MSU personnel who had or should have had knowledge Nassar's misconduct, including Strampel, were the moving forces or causes of repeated constitutional injuries to Plaintiff and others based on their failures to report, train, supervise, investigate, or otherwise act in response to complaints of Nassar's conduct.

172.    Ultimately, the MSU Defendants and Strampel failed to adequately and properly investigate the complaints of Plaintiff or other similarly-situated individuals including but not limited to failing to:

a.    thoroughly reviewing and investigating all policies, practices, procedures and training materials related to the circumstances surrounding the conduct of Nassar;

b.    recognizing sexual assault when reported in 2014 and permitting University officials to deem sexual assault as "medically appropriate" and "not of a sexual nature;" and,

c.    ensuring all guidelines issued following the 2014 investigation into Nassar's conduct were satisfied.

173.    As indicated in the U.S. Department of Education Office of Civil Rights report, the MSU had a culture that permitted a sexually hostile environment to exist affecting numerous individuals.

174.    Also indicated in the report was MSU's custom, practice, and/or policy of failing to address complaints of sexual harassment, including sexual violence, in a prompt and equitable

manner which caused and may have contributed to a continuation of the sexually hostile environment.

175. By failing to prevent the aforementioned sexual assault, abuse, and molestation upon Plaintiff, and by failing to appropriately respond to reports of Nassar's sexual assault, abuse, and molestation in a manner that was so clearly unreasonable it amounted to deliberate indifference, Strampel is liable to Plaintiff pursuant to 42 U.S.C. §1983.

176. The MSU Defendants and Strampel maintained customs, policies, and practices which deprived Plaintiff of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. §1983.

177. The MSU Defendants and Strampel tolerated, authorized and/or permitted a custom, policy, practice or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline Defendant Nassar, with the result that Nassar was allowed to violate the rights of persons such as Plaintiff with impunity.

## COUNT IV
## FAILURE TO TRAIN AND SUPERVISE
### 42 U.S.C. §1983
*against Defendant Strampel*

178. Plaintiff restates and incorporates here all previously stated allegations.

179. The MSU Defendants and Strampel have the ultimate responsibility and authority to train and supervise its employees, agents, and/or representatives including Nassar and all faculty and staff regarding their duties toward students, faculty, staff, and visitors.

180. The MSU Defendants and Strampel failed to train and supervise their employees, agents, and/or representatives including all faculty and staff, regarding the following duties: a. perceive, report, and stop inappropriate sexual conduct on campus; b. provide diligent supervision

26

over patients; c. report suspected incidents of sexual abuse or sexual assault; d. ensure the safety of all students, faculty, staff, and visitors to Defendant MSU's campuses premises; e. provide a safe environment for all students, faculty, staff, and visitors to Defendant MSU's premises free from sexual harassment; and, f. properly train faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment.

181.    The above list of duties is not exhaustive.

182.    Strampel had supervisory authority over Nassar.

183.    At all relevant times, Strampel was the Dean of the College of Osteopathic Medicine under which Nassar worked as an Associate/Assistant Professor.

184.    Strampel's failure to adequately supervise, investigate and enforce guidelines regarding Nassar, especially after he and MSU knew or should have known of complaints regarding his nonconsensual sexual touching and assaults during "treatments" was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff.

185.    Strampel failed to train, supervise and monitor Nassar regarding inappropriate touching, informed consent and chaperone practices.

186.    Strampel's actions were so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff and a reckless disregard for the obvious consequences of his actions.

187.    Strampel's omissions deprived Plaintiff of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. §1983.

188.    As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiff suffered, among other things, humiliation, degradation, and emotional distress.

## COUNT V
## SEX TRAFFICKING
### TVPRA, 18 U.S.C. §§ 1591, 1595
*against the MSU Defendants and Nassar*

_____

189.    Plaintiff restates and incorporates here all previously stated allegations.

190.    Nassar provided medical care and treatment to patients in multiple states, including but not limited to the State of Michigan.

191.    The MSU Defendants also promoted Nassar's skill and employment to people outside of the State of Michigan including, upon information and belief, through its promotion of Nassar on its websites, which were accessible to persons in multiple states.

192.    Upon information and belief, through multi-state medical practice and promotion, Nassar built a reputation and prominence that assisted his ability to obtain employment at MSU and to obtain patients, including Plaintiff.

193.    Nassar knowingly made false material representations to Plaintiff and her parent regarding his care and treatment of her, misrepresenting to Plaintiff that his actions toward her were and/or would be in furtherance of proper and necessary medical treatment and procedures.

194.    Nassar knew the representations were false at the time that he made them because he was educated and skilled in proper medical treatment and procedures, and he knew that he did and would touch and interact with Plaintiff in a manner that was not medically proper or necessary, but rather was for the purpose of his own sexual gratification.

195.    Nassar knew that Plaintiff would rely on his false representations because he was a prominent physician and she was a lay patient with no medical knowledge or experience against which to gauge Nassar's conduct.

196.    In addition, the nature of Plaintiff's and Nassar's physician-patient relationship imported a degree of legitimacy and materiality to Nassar's misrepresentations regarding the nature and necessity of his medical "treatments."

197.    Nassar intended for Plaintiff to rely on his misrepresentations because he offered them in explanation of his sexually abusive conduct, and he knew that Plaintiff was reliant upon Nassar's medical care and information for her physical health.

198.    Plaintiff reasonably relied on Nassar's misrepresentations to her detriment, suffering sexual abuse, with the attendant emotional and mental harm, as a result.

199.    In addition, Nassar coerced Plaintiff to comply with his sex acts.

200.    Pursuant to 18 U.S.C. §1591(e)(2), "coercion" includes "any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm" to that person.

201.    In this instance, Nassar committed sex acts under the guise of medical treatment for physical injury.

202.    Plaintiff reasonably believed that compliance with Nassar's directions and submission to his actions were necessary for her medical treatment and improved performance, and that conversely, non-compliance could result in serious harm.

203.    Nassar knew that Plaintiff and his other patients depended on him for medical care and understood that compliance with his directions, treatment plan and actions were necessary for their physical health.

204.    Nassar's scheme, plan and pattern was to exploit this fear and cause Plaintiff and multiple female patients to believe that refusal or failure to submit to his sex acts, committed under the guise of medical care, would result in serious physical harm.

205.     Thus, knowingly, and consistent with his *modus operandi*, Nassar employed fraud and coercion to entice and obtain Plaintiff for the purpose of causing Plaintiff to engage in commercial sex acts.

206.     18 U.S.C. §1591(e)(3) broadly defines a "commercial sex act" as "*any* sex act, on account of which *anything* of value is given to or received by *any* person."

207.     Congress's use of broad and expansive language in its statutory definition of a "commercial sex act," including the words "any" and "anything," compel a liberal reading of the statute.

208.     The sexual misconduct alleged by Plaintiff, including sexual touching of her buttocks and digital penetration of her vagina, constitute "sex acts," within the meaning of 18 U.S.C. § 1591.

209.     The sex acts were "commercial" because a person received something of value on account of the sex acts.

210.     Among other things, on account of Nassar's sexual abuse, committed under the guise of medical care, the following things of value were received by persons:

a.   Nassar received financial remuneration in payment for his "treatment" of Plaintiff; and

b.   The MSU Defendants received financial remuneration in payment for Nassar's "treatment" of Plaintiff..

211.     For these reasons, Nassar's conduct constitutes sex trafficking in violation of 18 U.S.C. § 1591, for which he is liable to Plaintiff for the substantial harm caused.

212.     In addition, Plaintiff was (and is currently) under the age of 18 years old when Nassar committed sex acts upon her.

213.    Nassar's enticement of Plaintiff to attend medical sessions and commission of a sex act upon Plaintiff for which anyone received anything of value constitutes sex trafficking in violation of 18 U.S.C. §1591, regardless of whether means of force, fraud or coercion were used to cause the sex act.

214.    The MSU Defendants are vicariously liable for Nassar's conduct because, at all relevant times, Nassar acted as their employee and agent, over whom the MSU Defendants possessed and exercised control.

215.    The MSU Defendants employed Nassar at the MSU Sports Medicine Clinic.

216.    Upon information and belief, Nassar was subject to the MSU Defendants' employee policies and procedures.

217.    Upon information and belief, Nassar was supervised by MSU personnel, including Strampel.

218.    In his role as an employee and agent of the MSU Defendants, and at facilities believed to be owned, operated and controlled by the MSU Defendants, Nassar sexually abused female patients, including Plaintiff.

219.    As early as 1997 or 1998, MSU was notified of Nassar's sexual abuse of female patients.

220.    Over the subsequent 20 years, multiple female patients reported Nassar's sexual abuse to the appropriate persons at MSU.

221.    The MSU Defendants failed to prevent their employee and agent from continuing to abuse female patients, resulting in the sexual abuse of multiple female patients, including the commission of sex acts upon which Plaintiff brings her sex trafficking claim.

222.    As a result, the MSU Defendants are vicariously liable for Nassar's actions.

## **RELIEF REQUESTED**

Plaintiff requests that the Court enter an order granting Plaintiff all available relief and remedies allowable under the law, including but not limited to:

a.  compensatory damages;

b.  punitive damages;

c.  attorney fees and costs; and

d.  all other legal and equitable relief determined by the Court to be appropriate.


Respectfully Submitted,

/s/ Jennifer B. Salvatore
Jennifer B. Salvatore (P66640)
Nakisha N. Chaney (P65066)
SALVATORE PRESCOTT & PORTER
105 E. Main Street
Northville, Michigan 48167
(248) 679-8711
salvatore@spplawyers.com
chaney@spplawyers.com


Dated: September 7, 2018

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JANE DOE, a minor,
by her next friend L.C.,

     Plaintiff,

                                  Case No.

v.                                     Hon.

MICHIGAN STATE UNIVERSITY,
THE BOARD OF TRUSTEES OF
MICHIGAN STATE UNIVERSITY,
LAWRENCE GERARD NASSAR (individually),
and WILLIAM D. STRAMPEL (individually),

     Defendants.

---

Jennifer B. Salvatore (P66640)
Nakisha N. Chaney (P65066)
SALVATORE PRESCOTT & PORTER
105 E. Main Street
Northville, Michigan 48167
(248) 679-8711
salvatore@spplawyers.com
chaney@spplawyers.com

---

**JURY DEMAND**

    Plaintiff demands a trial by jury in this matter.

                            Respectfully Submitted,

Dated: September 7, 2018          /s/ Jennifer B. Salvatore
                            Jennifer B. Salvatore (P66640)
                            Nakisha N. Chaney (P65066)
                            SALVATORE PRESCOTT & PORTER
                            105 E. Main Street
                            Northville, Michigan 48167
                            (248) 679-8711
                            salvatore@spplawyers.com
                            chaney@spplawyers.com